BLECHER COLLINS PEPPERMAN & JOYE, P.C.
Maxwell M. Blecher (State Bar No. 26202)
mblecher@blechercollins.com
Courtney A. Palko (State Bar No. 233822)
cpalko@blechercollins.com
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
Telephone: (213) 622-4222
Facsimile: (213) 622-1656

Attorneys for Plaintiff
NOVATION VENTURES, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| NOVATION VENTURES, LLC,<br><br>                Plaintiff,<br><br>        vs.<br><br>THE J.G. WENTWORTH COMPANY, LLC, a Delaware limited liability company, formerly known as JGWPT HOLDINGS, LLC; THE J.G. WENTWORTH COMPANY, a Delaware corporation, formerly known as JGWPT, INC.; J.G. WENTWORTH S.S.C. Limited Partnership, a Nevada limited partnership; PEACH HOLDINGS, LLC, a Delaware limited liability company dba "PEACHTREE FINANCIAL SOLUTIONS" and as "OLIVE BRANCH FUNDING,"<br><br>                Defendants. | Case No. 2:15-cv-00954-BRO (PJWx)<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATIONS OF:**<br><br>**(1)  SECTION 7 OF THE CLAYTON ACT;**<br><br>**(2)  SECTION 2 OF THE SHERMAN ACT;**<br><br>**(3)  SECTION 43 (a) OF THE LANHAM ACT;**<br><br>**AND**<br><br>**(4)  CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200**<br><br>**[DEMAND FOR JURY TRIAL]** |

Blecher Collins
Pepperman & Joye

Plaintiff Novation Ventures, LLC ("Novation"), demanding trial by jury, files this Second Amended Complaint for damages, disgorgement of profits, injunctive relief, and attorneys' fees, and complains and alleges as follows:

## I.

## NATURE OF THE CASE

1.     This case challenges whether an entity in a defined relevant market may first acquire its largest competitor, giving it approximately 75% of the market, and then abuse that dominance by knowingly and deceptively leading consumers to believe its three operating entities described below are offering separately competing bids when they, in truth, are not, to injure competition, competitors, and consumers.

## II.

## JURISDICTION AND VENUE

2.     The first and second claims for relief in this Second Amended Complaint set forth claims under the antitrust laws to recover damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15) and to secure injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26) for Defendants' violations of Section 2 of the Sherman Act (15 U.S.C. § 2) and Section 7 of the Clayton Act (15 U.S.C. § 18) against Defendants The J.G. Wentworth Company, LLC; The J.G. Wentworth Company; J.G. Wentworth S.S.C. Limited Partnership; and Peach Holdings, LLC.

3.     Claim Three sets forth a claim under Section 43(a) of the Lanham Act, which claim arises out of the same body of operative facts.

4.     Claim Four sets forth a claim under California Business & Professions Code § 17200, which arises out of the same body of operative facts and which invokes this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

5.     Each Defendant transacts business and is found within the Central District of California.

### III.

### PARTIES

6.      Plaintiff Novation Ventures, LLC ("Novation") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 1641 Worthington Road West, Palm Beach, Florida 33409.  Novation is engaged in the business of purchasing structured settlement payment receivables by buying the right to receive scheduled future payments from individual settlement recipients who do not wish to or cannot wait years for their annuitized payments.

7.      Defendant The J.G. Wentworth Company, LLC, formerly known as JGWPT Holdings, LLC ("JGWPT Holdings"), is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 201 King of Prussia Road, Radnor, Pennsylvania 19807. Defendant The J.G. Wentworth Company, formerly known as JGWPT, Inc. ("JGWPT"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business also at 201 King of Prussia Road, Radnor, Pennsylvania 19807.  Hereinafter, The J.G. Wentworth Company business entities will be referred to individually and collectively as JG Wentworth, which presents itself to the public using trademarked brand names including "JG Wentworth," "Peachtree," and "Olive Branch Funding."  JG Wentworth is by far the largest participant in the factoring of structured settlements, with about 75% of the U.S. structured settlement purchasing market.  Like Novation, JG Wentworth is engaged in the business of purchasing structured settlement payment rights by buying the right to receive scheduled future payments from consumers who do not wish to or cannot wait years for their annuitized settlement.

8.      Defendant Peach Holdings, LLC, dba Peachtree Financial Solutions, ("Peachtree") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business now located at the same

-2-

Blecher Collins
Pepperman & Joye

1  Radnor, Pennsylvania address as Defendant JG Wentworth.

2      9.     Defendant J.G. Wentworth S.S.C. Limited Partnership, a Nevada

3  limited partnership with its principal place of business at the same Radnor,

4  Pennsylvania address as Defendant JG Wentworth, is the record owner of the

5  federal trademarks: "Peachtree Financial Solutions," "The JG Wentworth

6  Company," and "JGWPT Holdings," and is wholly controlled by Defendant JG

7  Wentworth.

8      10.    The federal trademark "Olive Branch Funding" is registered to

9  "Structured Originations, LLC," a Nevada limited liability company, which is

10 owned and controlled by "Structured Funding, LLC," a Delaware limited liability

11 company, which is owned and controlled by Peachtree and/or JG Wentworth.

12 Although "Olive Branch Funding" presents itself to the public as if it were a

13 company competing with JG Wentworth and/or Peachtree, it is, in fact, merely

14 another name used by JG Wentworth.

15                              **IV.**

16            **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

17 A.    **The Acquisition**

18     11.    Prior to its acquisition of Peachtree in August 2011, JG Wentworth had

19 been Peachtree's largest competitor, funding 40-45% of the structured settlement

20 factoring transactions completed in the United States annually.  JG Wentworth and

21 Peachtree each would broadcast television ads and compete with one another and

22 others for on-screen "shelf space" and position in pay-per-click Internet advertising.

23 Most importantly, prior to the 2011 merger, individuals considering a sale of some

24 or all of their structured settlement payment rights could and did solicit and receive

25 competing bids from JG Wentworth, Peachtree, Olive Branch Funding, and others

26 for their structured settlement payments and have the various companies compete

27 with one another on price.  Subsequent to the acquisition, JG Wentworth, Peachtree,

28 and Olive Branch are operated as a single integrated non-competing entity.

Blecher Collins
Pepperman & Joye

BC
PJ

12.    JG Wentworth acquired Peachtree in August 2011.  On information and belief, JG Wentworth secured approval to acquire and/or merge with Peachtree (and to thereby achieve, between them, an overwhelming share of the relevant market) by representing that the process by which competing companies had bid against one another to purchase structured settlement cash flows from individual sellers would continue and would serve to protect consumers; but then, post-merger, proceeded to systematically corrupt and frustrate that competitive bidding process.  After the acquisition, JG Wentworth terminated nearly all of Peachtree's employees engaged in bidding to purchase structured settlement payments from individual sellers and relocated a handful of surviving employees to JG Wentworth's Radnor, Pennsylvania headquarters.  Since the acquisition, JG Wentworth has controlled Peachtree branding, payment purchasing, advertising, marketing, product offerings, and transaction pricing.

13.    "Olive Branch Funding" is an additional brand operating under JG Wentworth's ownership, control, and management.  Like Peachtree, "Olive Branch Funding" presents itself to the public as a purchaser of structured settlement payment rights.  Like Peachtree, Olive Branch Funding's payment purchasing, branding, advertising, marketing, product offerings, and transaction pricing is controlled by JG Wentworth.

14.    Although JG Wentworth advertises and presents itself to the public using (at least) three distinct brand names (JG Wentworth, Olive Branch Funding, and Peachtree), those brands are under the common ownership and control of The JG Wentworth Company – a fact discussed in materials targeting JG Wentworth's investor audiences, but not clearly revealed or disclosed in the brands' consumer-facing websites, TV advertising, or print materials.  What JG Wentworth says (and doesn't say) in each of its various brand guises; where, how, and when it uses each of those brand names in its advertising and communications with actual and prospective structured settlement sellers; what each JG Wentworth-controlled brand

1 tells (or doesn't tell) prospective individual sellers about the value of their structured

2 settlement payments rights or about any offer or price that any other JG Wentworth-

3 controlled brand may have made to the same individual for those payments; what

4 branded ad Google is paid to display, in which search result position, when an

5 individual seller types any given search term into a desktop or mobile Internet

6 browser; and what price(s) a JG Wentworth-controlled brand offers to any

7 individual seller for any given set of structured settlement payment rights in each of

8 its brand guises is all controlled and coordinated by the brands' common owner and

9 manager: The JG Wentworth Company.

10      15.     JG Wentworth is now by far the largest single player in the structured

11 settlement factoring business.  Operating under trademarked brand names such as

12 JG Wentworth, Peachtree Financial, and Olive Branch Funding, JG Wentworth

13 controls about 75% of the total market and accounts for at least 75% of the

14 structured settlement purchasing industry's revenues and profits.  The acquisition

15 combined the two largest competitors and affords the surviving entity or entities a

16 monopsony market share, which standing alone, would violate section 7 of the

17 Clayton Act (15 U.S.C. § 18) and entitle Novation to equitable relief.  Coupled with

18 its post-acquisition conduct, as set forth below, JG Wentworth and its subsidiaries

19 violate the attempt to monopolize and monopolization clauses of Section 2 of the

20 Sherman Act (15 U.S.C. § 2), Section 43(a) of the Lanham Act, and Section 17200

21 of the California Business & Professions Code.

22 **B.**     <u>**Nature of Trade and Commerce**</u>

23      16.     The relevant product market in the antitrust claims is the purchasing of

24 structured settlement payment receivables from individual consumer sellers.  The

25 product market includes the pool of goods or services that enjoy reasonable

26 interchangeability of use and cross-elasticity of demand.  This relevant market

27 definition encompasses all economic substitutes for the product.  There is no

28 product or service which, from the standpoint of the individual seller, is an effective

Blecher Collins
Pepperman & Joye

1    substitute for a structured settlement.

2        17.    Unlike consumer markets where businesses compete to _sell_ goods or
3    services to consumers; in structured settlement factoring, a small number of
4    specialized businesses bid to _buy_ structured settlement payment rights *from*
5    individual sellers in privately negotiated transactions where price and transaction
6    terms are individually negotiated by individual sellers. Thus, this is not an industry
7    where businesses compete on the basis of differences in what each is selling –
8    because their businesses are not "selling" anything.  There are no published
9    reference prices nor is there information available to individual sellers about recent
10   prices or rates for comparable purchases and sales.  Rather, in any given transaction,
11   one or more structured settlement factoring businesses bid to buy (pay cash for) a
12   specific set of structured settlement payment rights offered for sale by a given
13   individual seller at a price to be negotiated between buyer and seller.

14       18.    The relevant geographic market is the United States.

15       19.    The state and federal regulatory framework has shaped how the
16   structured settlement purchasing market has developed, creating significant barriers
17   to entering and conducting the business of buying structured settlement receivables
18   from individual sellers.  As a consequence, individual settlement sellers face
19   significant obstacles in finding purchasers willing and able to bid for and acquire
20   their structured settlement receivables.

21       20.    There are only a handful of companies competing for the factoring of
22   structured settlement payment rights in the United States.  Post-acquisition of
23   Peachtree, JG Wentworth is by far the largest, with a market share of about 75%.
24   Novation has a market share believed to be no more than 7%.

25       21.    Given the opportunity, JG Wentworth (whether branded as JG
26   Wentworth or as Peachtree or as Olive Branch), Novation, and others will bid for
27   and buy the right to receive scheduled future payments from persons who do not
28   wish to or cannot wait years for the annuitized settlement.  The purchasing

(sometimes called "factoring") company offers to pay the individual seller cash up-front and, in exchange, receives the consumer's right to receive some or all of their future settlement payments.  Typically, an individual seller will sell only a part of their future payments to raise cash for a specified need.  Some structured settlement recipients will, over time, enter into multiple factoring arrangements over a period of years, each time selling different fractions of different specified future payments to one or more purchasing or factoring companies.  Indeed, a significant portion of JG Wentworth's business is buying from sellers who have, in the past, already sold a *portion* of their structured settlement payment rights to "JG Wentworth," "Peachtree," or "Olive Branch."

22.     In the structured settlement purchasing business, what is bought and sold is different in each transaction.  There are no posted or standard prices or reference rates published or available to sellers.  Pricing in each transaction is the result of private negotiation between the individual seller and factoring company buying the payments.  Two otherwise identical sellers, with otherwise identical streams of settlement payments to sell, could (and routinely do) receive vastly different prices from JG Wentworth (or its alter egos) depending on whether JG Wentworth learns that the prospective seller is entertaining a bid for those same payments from a *bona fide* competitor (and not merely a JG Wentworth alter ego).  JG Wentworth (and indeed, Novation, or any rational bidder) will offer and pay more to "win" a given deal if it knows that the seller is considering a competing bid.  Conversely, JG Wentworth (and indeed, Novation, or any rational bidder) will offer and pay less to win any given deal if it is confident that the seller is *not* considering a competing bid.  Thus, all these other things being equal, the price any individual seller is able to negotiate for their settlement payments is most heavily influenced by whether or not the individual seller has "shopped" among competing purchasers and received genuinely competitive bids from them.

23.     Because there are no posted prices or reference rates and because

Blecher Collins
Pepperman & Joye

1   pricing in each transaction is the result of individualized private "negotiation,"

2   information about one seller's transaction cannot and does not influence the pricing

3   secured by another seller in a different negotiation.  Thus, JG Wentworth can and

4   does price-discriminate, paying more when it faces genuine competition and must

5   "bid up" to win the deal; much less when it does not have to do so.  In contrast to

6   product or service markets where pricing is standardized or pricing information in

7   one transaction informs the pricing negotiation in subsequent transactions; the

8   pricing power enjoyed (and profits reaped) by JG Wentworth in the purchases it

9   negotiates free from genuine competition is *not* a benefit shared by Novation.  In the

10  very few instances where a seller is able to find a true competitor to JG Wentworth,

11  Novation (or any other bona fide competitor) must "bid up" and compete on price to

12  win deals away from JG Wentworth and the array of JG Wentworth alter egos.  By

13  concealing their status as a single entity, JG Wentworth, Peachtree, and Olive

14  Branch unfairly distort the bargaining process.

15          24.     A very large number and a high percentage of all structured settlement

16  factoring transactions take place in California and are submitted by each of the

17  parties (Novation, JG Wentworth, Peachtree, or Olive Branch) to superior courts of

18  the State of California for review and approval in accordance with California

19  Insurance Code §§ 10134 – 10139.5.

20          25.     In each petition to approve a proposed transfer of structured settlement

21  payment rights, a superior court judge is asked to find that the proposed transaction

22  is "fair" and in the selling consumer's "best interests."  In making that determination

23  and finding, many courts will assess the selling consumer's capacity to handle her

24  own affairs and give some weight to a seller's ability to "shop around" and/or

25  consider other options.  Indeed, the best and perhaps only way for an individual

26  seller to obtain the highest price possible in selling her structured settlement

27  payment rights is through *shopping* – finding and soliciting genuinely competing

28  bids.  In that regard, courts may take some comfort in seeing that some sellers

Blecher Collins
Pepperman & Joye

-8-

1  choose JG Wentworth, others appear to choose Peachtree or Olive Branch.  Some

2  sellers may report to courts that they have "shopped around."  Neither courts nor

3  consumers are told that JG Wentworth and Peachtree and Olive Branch are one and

4  the same: commonly owned and controlled; brands which pretend to (but do not

5  actually) compete with each other.

6      26.    The court approval process is not a sufficient safeguard to prevent harm

7  to consumers stemming from a subversion of the bidding process through the use of

8  shills and alter egos.  The court approval process was never designed to substitute

9  for the price discipline of marketplace bidding.  Indeed, the court review and

10 approval process assumes that the consumer seller has come to court seeking

11 approval after weighing and considering genuinely competing bids and alternatives.

12 The state courts, in reviewing these transactions, do not (and cannot) conduct

13 independent price comparisons or organize auctions on behalf of consumer sellers;

14 the courts' findings are necessarily limited to the procedure set forth in the

15 applicable state "structured settlement transfer" statute – which does not

16 contemplate a court-supervised auction.

17     27.    Reports published by the insurance industry suggest that there are about

18 700,000 people scheduled to receive structured settlement payments in the United

19 States, with about 75,000 of them living in California.  Of these, fewer than 2,000

20 structured settlement factoring transactions are presented to California courts for

21 review annually.  With structured settlement recipients representing only about 1/3

22 of 1% of the total population and structured settlement sellers representing only 2-

23 3% of that number, structured settlement factoring is a niche market – served by a

24 handful of specialty purchasing businesses.

25     28.    Individuals seeking to sell their structured settlement payment rights

26 face an array of structural obstacles – especially if they want to find genuinely

27 competing bids.  Indeed, there are significant barriers to entering and serving this

28 niche market.  Most businesses lack the capital to buy and hold structured settlement

Blecher Collins
Pepperman & Joye

1 payment rights.

2    29.    By regulation, most commercial banks and other regulated lenders

3 generally are not allowed to hold long duration and illiquid receivables nor to trade

4 with consumers in transactions where pricing is negotiated on a case-by-case basis.

5 And there are other regulatory barriers.  Under federal tax law (Internal Revenue

6 Code § 5891), buying structured settlement payment rights without first obtaining

7 the specific individualized approval of a state court subjects the purchaser to a

8 punishing excise tax.  Under applicable state laws (*see, e.g.*, California Insurance

9 Code § 10139.5), one cannot acquire structured settlement payment rights without

10 first obtaining the approval of a state court, which must make an array of required

11 findings before the transaction can be consummated.

12    30.    Even if banks and traditional lenders were permitted to buy and hold

13 long-term illiquid receivables such as "structured settlements," most lack the

14 specialized staff and infrastructure required to negotiate individualized pricing and

15 efficiently present each proposed transaction to local courts for required approvals.

16 Moreover, because prospective sellers are few and scattered around the country,

17 there simply are not enough customers in any one place to support the specialized

18 infrastructure necessary to conduct the business locally.

19    31.    To be viable, a structured settlement factoring business must have the

20 capital to acquire and hold long duration illiquid cash flows; must employ the

21 specialized staff and infrastructure needed to negotiate, document, and underwrite

22 these transactions and obtain local court approval of them; and such companies must

23 operate nationally at scale.

24    32.    Novation was organized in 2001 and was one of the first companies to

25 compete vigorously against Defendants JG Wentworth and Peachtree, doing so with

26 marked success from 2001 until at least 2011 (when JG Wentworth and Peachtree

27 merged).  Novation is not a "new" entrant and had no trouble operating (and indeed

28 flourishing) under the state and federal regime which has prevailed since at least

1    2001.  At least until the time of the JG Wentworth-Peachtree merger, Novation

2    successfully competed with JG Wentworth, Peachtree, and others to serve a need

3    unmet by banks or more traditional lenders.

4         33.    Individuals seeking to trade their structured settlement payment rights

5    for "upfront" cash can't simply walk into their neighborhood bank or open the

6    "yellow pages" and find a business able to purchase such payments.  The individual

7    seller must find one of the handful of national structured settlement purchasers

8    serving this niche market.  Then, if that seller wishes to "shop" for the best price

9    (because pricing is negotiated, private, and neither standardized nor posted), he or

10   she also must find a _bona fide_ competing bidder.

11        34.    Purchase prices in such transactions can range from as little as $5,000

12   to $1,000,000 (or more) – depending on the nature, size, and timing of the payments

13   being purchased.  Not every seller of structured settlement payment rights "shops"

14   for competing bids; but most do or <u>try</u> to.

15        35.    When individual sellers of structured settlement rights shop among

16   genuinely competing bidders, they get better deals – more cash for any given set of

17   payments offered for sale.  To do so, an individual seeking to _sell_ his or her

18   settlement needs to either find a buyer or be found by a buyer.  As a rule, individual

19   sellers do _not_ advertise their settlement payments for sale.  Even if individual sellers

20   knew how to advertise their settlements (in a classified ad, on "eBay" or on

21   "Craigslist" for example), few would want to do so and many believe that they

22   could not legally do so because their settlements are confidential.  Some individuals

23   seeking to sell their settlement payments will respond to an advertisement seen on

24   TV.

25   C.   **The Strategic Importance of the Top Three Paid Search Listings**

26        36.    Typically, individuals (or their advisors) seeking to find a buyer for

27   their structured settlement payment rights (or looking for a better priced alternative

28   to a bid they've already received) will search the Internet using Google or in some

Blecher Collins
Pepperman & Joye

-11-

instances another "search engine."  A desktop computer user may be offered hundreds of "pages" of search results, but only the top listings on the first page of results are likely to be reviewed and "clicked" on.  In recent years, with the advent of smart phones, the majority of all consumers' Internet searches are conducted on mobile phones and when so utilized to conduct the search, the small mobile screen offers room <u>only</u> for the top two or three results at a time.  The vast majority of search engine users investigate only a couple of the top listed companies and generally do not scroll further down through the search results.  Indeed, published industry statistics suggest that 95% of the traffic to websites from search engines come from listings appearing on the <u>*first*</u> page of the search results.

37.     JG Wentworth is well aware of the strategic importance of the top three paid search listings.  Some consumers may click on the very first listing and go no further, but most do "click through" to one or more of the top three listings displayed for any given Google search result.  Based on recent published surveys of millions of consumer searches, most people "click through" on slots one through three of search results only.  About 1/3 stay with the top listing only and go no further.  Few go beyond the top three.  And only 5% go beyond the first page of search results.

38.     As a recent study of online consumer behavior reports, "[a] website with the first position in the [Google] search results contributed to 33% of the [total] traffic, compared to 18% for the second position" [and only 11% for the third position].  *The Value of Google Results Positioning*, Chitika Insights, at p. 5, June 7, 2013, *available at* https://cdn2.hubspot.net/hub/239330/file-61331237-pdf/ChitikaInsights-ValueofGoogleResultsPositioning.pdf.

39.     After the first three listings, traffic drops off dramatically.  Very few real-world users ever scroll beyond the first page of search results.  As the same study confirms, "The drop in cumulative traffic moving from one page to another was even more significant. …When moving from page one to two, the traffic

Blecher Collins
Pepperman & Joye

1  drop[s] by 95%." *The Value of Google Results Positioning*, Chitika Insights, at p. 5,

2  June 7, 2013.

3       40.    When an individual holder of structured settlement payment rights

4  seeks to find buyers to bid for some or all of his or her structured settlement

5  payment rights, Internet search engines (including Google, Yahoo, and Bing) are the

6  principal research tool available.  These so-called search engines allow an individual

7  to type a search term or phrase (such as "structured settlement cash out," or "who

8  competes with Peachtree Settlement") and find online listings – including so-called

9  paid listings – from companies that offer to buy structured settlement payment

10 rights.  When using a mobile phone, only two or three paid listings are displayed

11 depending on screen size.

12      41.    The concentration of consumer traffic among the top two or three

13 search results has increased as the number of Internet searches have shifted from

14 desktop computers to small-screen mobile devices.  Most searches (both business

15 and consumer) are now on mobile devices.  Presumably with searches by consumers

16 only, mobile search now dominates.

17      42.    Google itself has confirmed that "Google searches on mobile devices

18 now outnumber those on personal computers."  Alistair Barr, *Google Rolls Out New*

19 *Ads as Mobile Searches Top PCs in 10 Countries*, Wall St. J. (Digits), May 5, 2015,

20 *available at* http://blogs.wsj.com/digits/2015/05/05/google-rolls-out-new-ads-as-

21 mobile-searches-top-pcs-in-10-countries/.

22      43.    Mobile device screens are smaller.  As a result, most sellers stay with

23 slots one through three visible on the first page.  And "…the smaller screens of

24 mobile gadgets leave less room for keyword-based ads."  Alistair Barr, *Google Rolls*

25 *Out New Ads as Mobile Searches Top PCs in 10 Countries*, Wall St. J. (Digits), May

26 5, 2015.

27      44.    Specific information about various companies (or brands) can be found

28 on their respective websites (or landing pages).  As shown on attached **Exhibit A**,

Blecher Collins
Pepperman & Joye

-13-

1  "screen shots" taken from a recent desktop search illustrate the results for a Google

2  search on Novation's brand name "Novation Settlement Solutions" (showing top

3  ranking paid listings for JG Wentworth, Peachtree, and Olive Branch).  Using a

4  mobile device, the search phrase "Who competes with JG Wentworth" is answered

5  with a paid listing for JG Wentworth alter ego "Olive Branch Funding."  *See*

6  attached **Exhibit B**.

7      45.    Similarly, on a mobile device, the Google search phrase "who

8  competes with Peachtree Settlement" is answered with a paid listing for "JG

9  Wentworth."  *See* attached **Exhibit C**.

10     46.    The responses in Exhibits B and C are false, deceptive, and misleading.

11 Because they are false, deceptive, and misleading, they distort the competitive

12 process, adversely impact independent competition of Defendants, and afford the JG

13 Wentworth brands a competitive advantage to the detriment of consumers.

14     47.    Because structured settlement purchasing transactions are individually

15 negotiated, pricing is not offered or advertised online.  To obtain specific pricing

16 information, a prospective seller must speak to a buyer's representative on the

17 phone.  In that phone conversation, the settlement buyer gathers information about

18 the seller, their settlement, the amounts and schedule of payments, the name of the

19 annuity company making payments, whether the individual seller has sold payments

20 before; and what the transaction is intended to fund.  At the same time, the court

21 review process is explained to the seller.  The required phone conversations can take

22 hours.

23     48.    Given the amount of time it takes to convey and gather the information

24 necessary to obtain a price quote over the phone, some prospective sellers may not

25 bother to seek a second quote.  But many (seeking a competitive bid) will use the

26 Internet (more often than not, on a mobile phone) to search for a better price.  In that

27 case, the same time-consuming process is repeated over the phone.  Once a seller

28 has invested the time in conveying information to and obtaining bids from at least

Blecher Collins
Pepperman & Joye

Blecher Collins
Pepperman & Joye

1  two companies they believe to be competing, relatively few will bother to search for

2  and solicit a third bid.  Even fewer will seek a fourth bid.  In the substantial majority

3  of transactions funded by JG Wentworth, an individual seller who may think she is

4  "shopping" never gets past JG Wentworth's array of alter egos to obtain a genuinely

5  competitive bid.

6         49.    In the relevant market, transactions negotiated free from actual

7  competition yield outsized monopsony profits for the purchaser.  Most sellers who

8  have invested time obtaining bids from two or three competing bidders (or brands

9  they believe to be competing bidders) generally won't bother to solicit a third or

10  fourth bid.  Knowing this, JG Wentworth uses an array of brand names designed to

11  appear to individual sellers as separate and independent companies and promotes

12  that fleet of fake brands to decrease the likelihood that its prospective customers will

13  find a genuinely competing bid.  Accordingly, Defendants are using their unlawfully

14  acquired market power to eliminate competitors, injure competition, and fleece

15  consumers.

16         50.    Whereas most of Novation's deals are done at rates and prices that

17  reflect competition (from JG Wentworth or others); most of JG Wentworth and

18  Peachtree and Olive Branch deals are not.  This is not because JG Wentworth's

19  customers are lazy and Novation's customers are determined shoppers.  Rather, it is

20  because JG Wentworth's customers are so often tricked by JG Wentworth into

21  thinking they're getting competing bids and Novation's customers are not.

22         51.    As a consequence of its ongoing misrepresentations and deception, JG

23  Wentworth (using three brands simultaneously) is *able* to bid more than its

24  competitors for more of the limited "paid search" ad slots specifically because the

25  rewards that JG Wentworth (dba JG Wentworth, Peachtree, or Olive Branch) can

26  reap from keeping actual and prospective sellers from ever finding a genuine

27  alternative bid far outstrip the rewards other purchasers (such as Novation) can hope

28  to earn in offering those same individual sellers a competitive bid.

52.     When a settlement purchasing company knows that it can reap more than $30,000 per transaction in profit if the purchase price can be negotiated with a seller free from genuine competition and will have to pay much more (and therefore profit much less) if that same purchase transaction becomes competitive, the purchaser can and will spend a lot to keep that customer from ever learning about real alternatives.  In contrast, a settlement purchasing business that follows the rules and does not utilize decoys and shill bidders cannot rationally bid such a premium to attract business.

53.     This market phenomenon leads to a reinforcing cycle, fueled by JG Wentworth's fraudulent and anticompetitive conduct vis-a-vis consumers.

54.     JG Wentworth knows that purchase prices negotiated free from actual competition will yield outsized profits.  And JG Wentworth also knows that individual sellers routinely use the Internet and mobile phones to look for competing bids.  Therefore, JG Wentworth (using multiple brands) bids for online ad space in a way that effectively excludes competitors like Novation from offering consumers an alternative.  To carry out this ongoing scheme, it is not sufficient that a JG Wentworth brand bid on only one position with only one brand.  JG Wentworth, using its multiple brands, often bids on multiple positions simultaneously and, using the fruits of that scheme, will pay whatever it takes so that its multiple brand offerings crowd out the competition and/or push the competition far down the page, making it less likely for a genuine competitor to be found among the welter of decoy offerings.  See, for example, attached **Exhibit A** (screen shot showing paid Google Search results offering consumers the "choice" of JG Wentworth, Peachtree, or Olive Branch in response to the search query: "Novation Settlement Solutions."

55.     It is not cheap for JG Wentworth, Peachtree, and Olive Branch to advertise three parallel brands simultaneously.  All other things being equal, the higher the ranking of a search result on a user's desktop computer or mobile phone screen, the more likely it is that the user will consider and "click on" that listing.

1    Thus, advertisers using Google's AdWords system compete with one another to
2    achieve a relatively higher position in Google's "paid search" rankings, bidding
3    more to achieve a higher ranking.  Since JG Wentworth's August 2011 acquisition
4    of Peachtree, JG Wentworth and its subsidiaries have paid Google at least $10
5    million and perhaps as much as $20 million in pay-per-click fees to direct Internet
6    users to websites and/or phone numbers managed and controlled by JG Wentworth
7    brands including both "JG Wentworth" _and_ "Olive Branch" _and_ "Peachtree" – in
8    violation of Google's own policy on not advertising competing brands which are
9    commonly owned, as described below.

10   **D.**      **JG Wentworth's Double-Serving Violates Google's Policies**

11          56.    JG Wentworth's conduct is barred by and violates Google's own rules
12   against "double-serving."  Prior to and after JG Wentworth's acquisition of
13   Peachtree, Google published a detailed and explicit rule barring so-called "double-
14   serving" of Google ads.  That rule, quoted below, prohibited affiliated advertisers
15   from bidding to buy more than one search result to be displayed in response to any
16   given search query.

17          57.    As Google's published rule explained: "Violations of this policy occur
18   when multiple websites share Common Ownership … plus when two or more of the
19   following factors are present: **Common product offering**: For physical goods being
20   sold, the sites share products in common such that a user browsing the site would
21   perceive little difference in inventory between the sites.  **Similar pricing:** When
22   pricing is available on the sites, there's a price difference between the sites of 25%
23   or less for substantially the same product or service.  When two or more sites solicit
24   contact information from users in order to provide a custom quote, they will be
25   considered to have zero price difference.  **Similar customer support experience:**
26   The sites offer the same or similar type of product or service for which the customer
27   can expect to receive the same or similar level of Support … **Brand:** The sites have
28   non-differentiated Brands … for which either the brand name is the same or the logo

1    is the same."

2          58.      JG Wentworth's post-merger conduct clearly and flagrantly violates

3    Google's stated "double-serving" policy.  Here, there are three "commonly

4    controlled companies or brands bidding to buy more than one search result to be

5    displayed in response to any given search query.  (1) Post-merger, JG Wentworth,

6    Olive Branch, and Peachtree *are* commonly owned and controlled.  (2) JG

7    Wentworth, Peachtree, and Olive Branch brands offer consumers/sellers exactly the

8    same thing: "cash in exchange for structured settlement payment rights."  (3) The

9    respective websites for JG Wentworth, Peachtree, and Olive Branch "solicit contact

10   information from users in order to provide a custom quote."  And (4) JG Wentworth,

11   Peachtree, and Olive Branch offer "the same or similar type of product or service for

12   which the customer can expect to receive the same or similar level of Support."

13   Indeed, individual sellers to Peachtree, Olive Branch, and JG Wentworth have their

14   purchases processed by a common legal and underwriting team, filed in courts by

15   the same lawyers; their assigned payments are collected by the same servicing team;

16   and financed and managed by the same investors and owners.

17         59.      Sometime in or since 2013, Google streamlined the expression of its

18   published "double-serving" rule to simply say that it is a violation of the Google

19   AdWords auction system for an advertiser to use "the Google Network to gain an

20   unfair traffic advantage over other participants in the auction.  • *Examples*:

21   Affiliates that advertise on AdWords against the applicable affiliate program rules,

22   promoting the same or similar content from multiple accounts on the same or similar

23   queries."  *Abuse of the ad network* (last accessed Oct. 8, 2015)

24   https://support.google.com/adwordspolicy/answer/6020954?hl=en&ref_topic=1626

25   336&vid=0-635799082930574004-3872379219.

26   **E.      Defendants' Intentional Misrepresentation and Deception**

27         60.      In response to a given search, JG Wentworth pays Google to

28   simultaneously show a JG Wentworth ad in position 1 AND a JG Wentworth alter

Blecher Collins
Pepperman & Joye

BC
PI

ego ads in positions 2 and/or 3.  In so doing, JG Wentworth is directing Google to show those sellers who are looking for an alternative to the company already found in the first position – what appear to be genuine competing alternatives in positions 2 and 3.  In fact, at JG Wentworth's express direction, such consumer sellers are shown shills for and alter egos of the company they've already been shown in the first search position.

61.    If JG Wentworth simply bought all three top search result positions using its principal brand name in each instance (like a beer company blanketing a stadium), consumers looking for an alternative would at least know to scroll down and look further.  But that candor would defeat the purpose of Defendants' deception, which is to divert and distract the very consumers who have shown by their online behavior that they are actively looking for a genuine alternative.

62.    JG Wentworth pays top dollar to claim the coveted first search listing while simultaneously displaying its decoys and shills on Internet "shelves" that individual sellers have been led to believe are reserved for genuine competitors.

63.    In this way, the individual seller is intentionally misled and deceived by JG Wentworth.  And Novation is harmed by JG Wentworth's active deceptions, leading to Novation's effective exclusion from the marketplace.

64.    Individual sellers who intend to shop for alternative buyers using Google as their research tool are hurt because they've been led to believe that they've found an alternative other than JG Wentworth to bid for the payments.

65.    Novation is hurt because it has been deprived of the ability to offer that individual seller a competitive alternative.

F.    **Consumers Are Actually Deceived by JG Wentworth's Misleading Conduct**

66.    JG Wentworth's advertising conduct (in violation of Google rules) is designed to be and is actually misleading to a substantial segment of its audience.

67.    When individual sellers use the Google search service, the users'

Blecher Collins
Pepperman & Joye

assumption and understanding is that each result they are shown is from a different company or service – especially if each APPEARS to be different by virtue of common visual cues and labels such as trademarked name, brand, phone number, and logo.

68.     Individual sellers are entitled to and do in fact make this assumption because (a) in their experience with using the Google service, that is generally how the service works; and (b) under the published rules that Google imposes on its advertisers, one advertiser (using different websites) is not allowed to run ads that fill multiple search results in response to any given search.

69.     Thus, when JG Wentworth places its own ad, in its own name in the first position, and then places its alter egos' ads in a position that Internet users believe to be reserved for offerings from different and competing companies, then JG Wentworth is actively misleading and deceiving individual sellers – not simply by what JG Wentworth's ads (or its alter egos' ads) say or conceal; but by when and where those alter ego ads are placed and displayed.

70.     The alter egos' paid search ad timing and placement is specifically programmed, by JG Wentworth, to be displayed in a place and time which itself deceives vast numbers of individual sellers who have been led to assume (by experience, context, and the rules of the service itself) that they are being shown an offering (in this case, a potential bidder for their most valuable asset) that is different and unrelated to the bidder they've already found listed in a preceding search result position.

71.     When a consumer using Google Search clicks on the 2nd or 3rd result displayed, he or she does so to find something different than what he/she has already found in listing #1.  When JG Wentworth pays Google to show a JG Wentworth ad in position 1 *and* a JG Wentworth alter ego in positions 2 and/or 3, JG Wentworth is paying to create a context in which the consumer is misled and deceived.

72.     The express purpose of that misleading action by JG Wentworth is to

Blecher Collins
Pepperman & Joye

trick individual sellers who click on listing 2 and/or 3 into believing they have found what they were looking for – an alternative to search results 1 and/or 2 – and to then proceed no further.  This activity (which violates Google's own rules and is designed to deceive every prospective seller who clicks on a JG Wentworth alter ego listing in search result positions 2 and 3) effectively excludes Novation from competing.

73.    JG Wentworth reaps outsized profits by deceiving individual sellers and flagrantly violating the Google rules. Novation cannot consistently outbid JG Wentworth for a sliver of space at the bottom of the display case when JG Wentworth's bidding for position is subsidized by the gains it reaps by violating Google's rules and deceiving consumers in ways that Novation does not.

74.    Individual sellers are actually deceived by JG Wentworth's conduct.  If JG Wentworth were simply outbidding Novation in a fair auction for the coveted first position, that might be deemed fair competition.  But research and experience show (and experts will testify) that most Internet and mobile phone users do bother to click on at least the second or third listing in a series of paid search results. Consumers who bother to consider (click on) the second or third listings do so specifically because they are seeking a genuine competing alternative to what they already have been shown or offered in the first listing.  Consumers who take the trouble to scroll down and click on ads found in the second or third positions are not simply looking for a different phone number for the very same company already listed in the first position.  The thousands of consumers who bother to scroll down and take the step of clicking on ads in the second or third position do so for one specific reason:  they expect to find genuine competing alternatives to the company they've already found in the higher listing position.

75.    Thus, an individual seller who clicks on a JG Wentworth alter ego ad run by JG Wentworth in the second or third search result position under a JG Wentworth ad, has by virtue of the very context in which he or she has been led to

1  take action — a context orchestrated and paid for by JG Wentworth — been

2  diverted and deceived by JG Wentworth to his or her detriment and to the

3  competitive harm and exclusion of genuine competitors such as Novation.

4    76. Once the individual seller's interest and attention has been so diverted,

5  the realistic possibility of Novation ever getting to offer that seller a competing

6  alternative is far diminished or extinguished.  Indeed, if JG Wentworth is permitted

7  to fill the first two or three search slots with ads from its own alter egos, only the

8  very rare outlier who scrolls far down into the listings can find a genuine competing

9  alternative.

10    77. JG Wentworth could simply spend more on the JG Wentworth brand

11  alone in an effort to win more new customers for JG Wentworth.  It doesn't do that.

12  Instead, it spends its marketing dollars supporting three seemingly different brands,

13  simultaneously chasing the same customers under three different names in an effort

14  to buy the same thing from them.  The fact that JG Wentworth spends tens of

15  millions of dollars on what could be seen as duplicative advertising is but one

16  measure of how much it knows it is worth to keep those customers from ever

17  finding real alternatives.  Accordingly, armed with its market power through the

18  unlawful acquisition, Defendants exploit that undue concentration of market power

19  and the lack of pricing transparency and information available to consumers by

20  consciously and deliberately suppressing the competitive process through the use of

21  shill and decoy brands.

22    78. When an individual seller contacts JG Wentworth, there is typically a

23  lengthy phone call to discuss a possible transaction.  JG Wentworth may offer an

24  indicative bid or schedule a follow-up conversation to discuss pricing.  If the same

25  seller seeks a second bid and contacts (or accepts a call from) JG Wentworth in the

26  guise of either its Peachtree or Olive Branch brands, there will be another lengthy

27  phone conversation.  At that point, either because the seller tells the representative

28  that they have been talking to JG Wentworth or because the seller's phone number is

1   seen and recognized by Peachtree's phone system, the Peachtree representative will

2   know that the seller is already in conversation with JG Wentworth.  Information

3   about and the fact of the Peachtree conversation will be known both to JG

4   Wentworth and Peachtree and their common bosses.  Neither Peachtree nor JG

5   Wentworth will advise the customer of the common ownership and control and each

6   will take the seller's time and information and purport to offer price quotes as if they

7   were two competing companies, bidding against one another when in truth the

8   bidding process is "rigged."

9        79.    Most individual sellers, having invested hours in two parallel sets of

10  negotiations and believing that they are receiving offers from two independent and

11  competing purchasers, will not bother to consider a third company.  Either way, a

12  JG Wentworth entity will win the deal.  As this process is repeated again and again,

13  Novation is deprived of the probability of reaching the majority of sellers who will

14  not bother to press on after spending hours on the phone with JG Wentworth,

15  Peachtree, and/or Olive Branch.  Novation is foreclosed from the process, and

16  thousands of consumers are deprived of the benefits of the competitive bidding

17  process.

18       80.    If JG Wentworth and Peachtree and Olive Branch were separate

19  entities, such collusive bidding would be facially anticompetitive and illegal.  It

20  remains anticompetitive and illegal when conducted by a single monopolistic

21  enterprise masquerading as competitors in a highly concentrated market lacking

22  transparency and comparison-shopping where pricing is negotiated, private, and

23  neither standardized nor posted.

24       81.    Nor does Novation benefit from the market concentration brought

25  about by the JG Wentworth-Peachtree merger.  In the increasingly rare case where a

26  tenacious customer presses on through JG Wentworth's many shills and decoys and

27  finds Novation, all that Novation has won is a chance to bid in a very competitive

28  situation such that Novation does *not* benefit from the reduced competition.  This

1   process (carried out by JG Wentworth through its use of misleading shills and

2   decoys) places Novation at a severe disadvantage, materially enhances the unfair

3   and uncompetitive edge, which the JG Wentworth entities exploit, costing individual

4   sellers (and Novation) many millions of dollars every year.

5   **G.    Anticompetitive Conduct**

6         82.    The root cause of the anticompetitive conduct described herein is the

7   illegal 2011 merger which has, in turn, led to an unbroken chain of events,

8   producing an anticompetitive scheme calculated to exploit the market power

9   acquired via the unlawful acquisition by eliminating or reducing competition to JG

10  Wentworth and Olive Branch and its former (but now fake) "competitor" Peachtree.

11        83.    Defendants have undertaken this course of conduct with the specific

12  intent of eliminating competitors, including Novation, and acquiring monopsony

13  control of the relevant market.  Moreover, Defendants not only have the specific

14  intent to monopolize, they have a high likelihood of succeeding.

15        84.    After the acquisition/merger described above, a common ownership

16  and management entity, maintains and promotes both brands, running ads for both

17  JG Wentworth and Peachtree as though they continue to be separate, competitive

18  entities when in fact they are commonly owned and managed.  It is this duplicity in

19  making it appear to the public that JG Wentworth and Peachtree are still competitors

20  that is a material part of the Sherman Act § 2 claims and the essence of Lanham Act

21  and unfair competition claims.

22        85.    In the context of Google "pay-per-click" advertising, JG Wentworth's

23  maintenance of three brands, each pretending to compete with the other, harms both

24  consumers and genuine competitors such as Novation.  By coordinating their

25  Google AdWords "pay-per-click" bidding and budgets, JG Wentworth and

26  Peachtree are able to consistently grab two and often three of the top three search

27  listing results on many of the keywords used by consumers searching for structured

28  settlement buyers.  This behavior crowds out competitors and/or drives up the cost

of being in second or third position in any given search ranking, making it more difficult and expensive for Novation to be found by potential customers looking for genuinely competing offers.  And this behavior also harms consumers, who are led to believe they are shopping among competing alternatives, but really are not.

86.     JG Wentworth and Peachtree and Olive Branch list themselves separately in Google's paid search results on the same keywords when in fact these brands are commonly owned and controlled.  This violates Google's policy. Defendants' coordinated ability to grab the most coveted search listings, which consumers believe – and Google and the competitive process require – to be genuinely competitive entities, are strategies intended to impair and actually impair the competition from rivals which is critical for promoting transparency and comparison-shopping.  But that does not occur.  In the overwhelming majority of transactions, JG Wentworth entities are able to bid free from the competitive discipline of Novation or any other genuine competitor – harming consumer welfare and  foreclosing genuine competitors.

87.     Novation will be able to provide statistical evidence measuring or quantifying those instances where it was never contacted because of JG Wentworth and Peachtree and Olive Branch's multiple listings on Google, and Novation was required to pay more to have its Google ad listings seen.  With that evidence, Novation can provide a statistical basis for determining the number of transactions from which it has been excluded and a plausible method to estimate its actual lost profit damages.

88.     Given Google's algorithm and JG Wentworth's iconic brand recognition and multiple entities buying up top listings, and given the fact that JG Wentworth is willing and able to bid and pay a premium for ad listings designed not only to find new leads, but to keep past and prospective customers from ever finding genuine competing alternatives, neither Novation (nor any insurgent challenger to JG Wentworth's market dominance) can sustain a campaign of outbidding JG

Blecher Collins
Pepperman & Joye

1   Wentworth's multiple brands for the top Google listings.

2       89.     By simultaneously bidding on the same key words (e.g., "cash for
3   structured settlement"), JG Wentworth and Peachtree and Olive Branch have been
4   able to "rig" the Google pay-per-click bidding system.  This "rigging" has had two
5   major anticompetitive effects.  *First*, it has driven up the cost of being in the 1st, 2nd,
6   or 3rd position so as to effectively preclude or minimize the competitive impact of
7   other entrants – it is simply harder to gain prominent display if one big participant
8   with a 75% market share is taking two or three of the three available positions
9   visible on a small mobile screen.  *Second*, and perhaps more importantly, JG
10  Wentworth and Peachtree and Olive Branch are deceiving consumers in that
11  structured settlement recipients seeking to shop among competing structured
12  settlement buyers might click on the one or two displayed entities and not proceed
13  further, believing – incorrectly – that when JG Wentworth and Peachtree and Olive
14  Branch occupy these top positions, consumers are getting the full benefits of
15  competitive bidding.  Because JG Wentworth and Peachtree and Olive Branch
16  customer databases and telephone systems are co-located and commonly owned and
17  controlled, JG Wentworth can know whether the consumer on the line already has
18  been in contact with Peachtree or Olive Branch (and vice versa) and can calibrate its
19  "pitch" and bidding accordingly.  And when a potential customer (unaware of the
20  two brands' common ownership) tells a Peachtree representative that they've
21  received a bid from JG Wentworth (or vice versa), one brand can give way to the
22  other – preserving both profit for the common parent and the comforting illusion of
23  vigorous competition.  There is, therefore, true bid-rigging involved, and the public,
24  competition, and competitors have been adversely affected.

25      90.     Because JG Wentworth and Peachtree and Olive Branch
26  simultaneously bid on the same search terms, consumers are deceived into thinking
27  they are exploring genuine competing alternatives when, in fact, they are getting
28  bids from three parts of the same integrated, commonly-managed entity.  And JG

Wentworth and its subsidiaries pay millions of dollars for "pay-per-click" advertising every year.  JG Wentworth, Peachtree, and Olive Branch are engaged in ongoing deception of consumers in violation of Google's policies and applicable state and federal law.  The end result is that a consumer who uses Google to find JG Wentworth and Peachtree thinks she has shopped around and received competitive bids but has not.  She has been "tricked."  And actual competitors, such as Novation, are frozen out of the opportunity to offer a better price and to win a share of the market, which JG Wentworth and Peachtree continue to dominate.  The present system serves to relieve JG Wentworth and Peachtree of the pressure normally created by competitive pricing and has permitted an artificially enhanced pricing structure that causes consumers to pay higher prices.

91.    This trend and adverse effects have been exacerbated and magnified because so many consumers now rely on small handheld mobile phones for Internet access, and this auctioning of space typically limits the willingness and ability of consumers to search beyond the top one or two of the displayed entities.  Accordingly, the present system has ensured that even price-sensitive consumers who do try to shop will often only find JG Wentworth and its sister brand Peachtree or Olive Branch displayed.

92.    The J.G. Wentworth Company (in its guise as JG Wentworth, Peachtree, and Olive Branch), through its deceptive and anticompetitive use of Google and other advertising, has played and continues to play a crucial and necessary role in enabling this "scam" on the public, competition, and competitors.  This conduct forecloses competitors such as Novation and short-changes consumers by huge sums while JG Wentworth profits handsomely from the above-described deception it perpetuates.

93.    Prior to 2011, the structured settlement industry was robust and competitive.  JG Wentworth was the largest competitor, with about 40% of the market.  Peachtree was close behind.  Other smaller entrants, including Novation,

1 were able to engage their larger rivals in direct competition for consumer

2 transactions.  Equally or more important, consumers/sellers were able freely to seek

3 competitive offerings and ensure they were getting a fair and reasonable deal.

4      94.    Prior to 2011, many structured settlement-factoring transactions were

5 conducted with and by sellers who had previously sold payments to JG Wentworth

6 or Peachtree.  About 45% of those prior transactions involved sales to JG

7 Wentworth and about 30% involved sales to Peachtree.  In many cases, those who

8 had sold a portion of their payments to JG Wentworth did so only after considering

9 a bid from (then independent) Peachtree.  And many who had sold a portion of their

10 payments to Peachtree did so only after considering a bid from (then independent)

11 JG Wentworth.  After the 2011 merger, many of JG Wentworth and Peachtree's past

12 customers sought to sell additional payments.  As before, many returned to either

13 Peachtree or JG Wentworth to obtain a bid for their remaining payments.  As before,

14 many sought a competing bid from the "other" brand.  Neither Peachtree nor JG

15 Wentworth disclosed to those sellers that the two former competitors had merged.

16 Sellers would consider and take one of the offers – never knowing that the two

17 brands were no longer independent.  Had the truth been disclosed to them, many

18 would have realized that they were not getting the competitive bidding they had

19 received in the past and would have moved on to seek a truly competitive bid from

20 Novation or some other genuine competitor.

21      95.    JG Wentworth's acquisition of Peachtree in August 2011 has triggered

22 a change in the nature of the industry to the detriment of competition and

23 consumers.  By almost any stated or objective standard, an acquisition by the

24 industry leader of its major rival, achieving a 75% market share and leaving the

25 remainder of the industry highly fragmented, was and is a violation of Section 7 of

26 the Clayton Act (15 U.S.C. § 18).  Accordingly, JG Wentworth's dominant position

27 in the industry is a result of an antitrust violation and not the product of superior

28 skill, industry, or foresight.

96.     JG Wentworth's acquisition of Peachtree was the commencement of a conscious, intentional, and deliberate effort to achieve monopsony power in the structured settlement purchasing business.

97.     Novation has not benefited from the reduction of competition.  Because Defendants are exploiting their market power acquired in the acquisition by unfair methods of competition, trickery, and deception, Novation is now competing against JG Wentworth, Peachtree, and Olive Branch while those entities are insulated from competition by crowding out true competition with their coordinated bidding.

98.     JG Wentworth's use of multiple brands is not analogous to a company (such as General Motors) offering separate brands of cars for sale on the basis of different styling or qualities or features.  JG Wentworth (through its fleet of alter egos) is in the business of _buying_ (not selling) specific sellers' structured settlement payments.  The only substantive "quality" differentiating the competing bidders is the amount of money each is offering to buy the thing being sold.  Thus, JG Wentworth's use of different brands is not analogous to a single parent company offering different brands of new cars.  It is more akin to a team of shills showing up to pretend to bid against one another as a hapless individual seeks to sell one specific used car.

99.     Since 2011, JG Wentworth has sought to exploit its dominant market share by ensuring its putative rivals could not effectively compete against it.

100.    Because consumers shop for structured settlement providers using the Internet and because of the established predicate that most consumers do not go past the second or third listed entity, JG Wentworth knows that if Defendants can occupy much of the displayed structured settlement providers on any given screen; and then waylay prospective customers with lengthy phone calls all while pretending to be competing buyers, it would ensure that the lion's share of the business remained with a JG Wentworth-owned entity, purchased at prices negotiated free from true competitive pressure.

1    101.   These economic conditions facilitate Defendants' exclusionary

2    strategies and exacerbate the anticompetitive effects: (1) high concentration in the

3    market; (2) high sunk costs and other entry barriers; (3) ability to raise rivals' costs,

4    for example, customer access that can be substantially foreclosed; and (4)

5    information asymmetries between Defendants and outside rivals, which enhance

6    Defendants' market power.

7    **H.    Foreclosure of Novation from the Market**

8    102.   Novation has been substantially foreclosed from competing in the

9    market for structured settlements by Defendants' bid rigging, predatory bidding, and

10   consumer deception, as explained herein.

11   103.   The effect of JG Wentworth's acquisition of Peachtree and its

12   purposeful deception of the public by concealing that (and other) ownership has

13   enabled JG Wentworth to achieve and maintain a monopoly of the structured

14   settlement industry in violation of Section 2 of the Sherman Act (15 U.S.C. § 2),

15   with the high probability that, unless prevented by this Court, it will succeed.

16   104.   Because of the search engine optimization formulas and JG Wentworth

17   entities' dominant market power and coordinated marketing activity, Novation is not

18   able to bid on one of the top AdWord listings and keep its listing among the top

19   search results.  This intentional deception and duplicity has materially restricted

20   Novation's access to those individual sellers seeking structured settlements.  The

21   public is far less aware of Novation's existence.  Given sellers' extensive use of

22   Google as a search engine, the prevalence of mobile phone searches where JG

23   Wentworth entities are the only listings seen, and JG Wentworth's extensive ability

24   to communicate with the public, Novation is precluded from effectively competing

25   with JG Wentworth.  Novation is unable to compete on a level playing field.  JG

26   Wentworth can now largely ignore Novation as a competitive force in the industry.

27   After sellers reach two or three JG Wentworth entities they believe are competitive

28   bids, they will not continue to search further.

Blecher Collins
Pepperman & Joye

1   105.   Similarly aggrieved smaller competitors are likewise hurt by the merger

2   and JG Wentworth's subsequent marketplace misconduct.

3   106.   Defendants' false advertising constitutes exclusionary conduct.

4   Defendants' representations are [1] clearly false, [2] clearly material, [3] clearly

5   likely to induce reasonable reliance, [4] made to buyers without knowledge of the

6   subject matter, [5] continued for prolonged periods, and [6] not readily susceptible

7   of neutralization or other offset by rivals.  The adverse effect on competition is not

8   *de minimis*.

9                                   **V.**

10   **CLAIMS FOR RELIEF UNDER THE FEDERAL ANTITRUST, LANHAM**

11   **ACT, AND STATE UNFAIR COMPETITION LAWS**

12   A.   **First and Second Claims:  Violations of Section 7 of the Clayton Act and**

13        **Section 2 of the Sherman Act**

14   107.   Novation repeats and alleges and incorporates by reference each

15   allegation set forth in Paragraphs 1–106, inclusive, of this Second Amended

16   Complaint with the same force and effect as if set forth in full herein.

17   108.   The actual and likely continued effect of JG Wentworth's acquisition of

18   Peachtree, has substantially lessened and will continue to substantially lessen

19   competition and to create a monopoly in interstate trade and commerce in the United

20   States factoring of structured settlements in violation of Section 7 of the Clayton

21   Act, 15 U.S.C. § 18.

22   109.   The aforesaid acquisition, taken together with the acts described in

23   paragraphs 1 through 108, inclusive, constitute a violation of Section 2 of the

24   Sherman Act, 15 U.S.C. § 2, in that those acts constitute and evidence an attempt to

25   monopolize and actual monopolization of the structured settlement relevant market

26   in the United States.

27   110.   As alleged herein, Defendants have engaged in the anticompetitive

28   conduct described herein with the specific intent to control prices and destroy

Blecher Collins
Pepperman & Joye

1   competition.

2      111.   As alleged herein, Defendants have engaged in the conduct described

3   willfully and intentionally in order to acquire and maintain a monopoly in the

4   business of factoring structured settlements in violation of Section 2 of the Sherman

5   Act (15 U.S.C. § 2).

6      112.   Defendants have achieved monopsony power in the business of buying

7   structured settlements, including, as evidenced by the allegations herein, the power

8   to control prices and exclude competition.  Alternatively, Defendants have

9   attempted to monopolize this relevant market in the United States and there is a

10  dangerous probability that they will achieve monopoly power therein unless

11  restrained by this Court.

12     113.   As a result of JG Wentworth's acquisition of Peachtree and subsequent

13  anticompetitive conduct, the following effects will continue to exist and/or are likely

14  to occur:

15        (a)   Actual and potential competition between JG Wentworth and

16  Peachtree has been eliminated in the United States, and JGWPT will emerge with

17  monopoly power;

18        (b)   In the long term, prices paid for structured settlement factoring

19  will diminish, to the injury of consumers;

20        (c)   The incentive to innovate and improve products will be reduced;

21  and

22        (d)   Consumers utilizing structured settlement factoring will be

23  deprived of a choice of vendors and will be forced to deal with a JGWPT entity.

24  **B.   Third Claim:  Violation of Lanham Act Section 43(a)**

25     114.   Novation repeats and alleges and incorporates by reference each

26  allegation set forth in Paragraphs 1–113, inclusive, of this Second Amended

27  Complaint with the same force and effect as if set forth in full herein.

28     115.   Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) provides, in

-32-

pertinent part, that "[a]ny person who… in connection with any … service…uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any … false or misleading description of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person … shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

116.    A false advertising claim under the Lanham Act requires: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product or service; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by lessening of the goodwill associated with its products.

117.    Defendants have made false, deceptive, and misleading statements of fact or taken actions which, in their reasonable context, concealed material facts, and made a material omission in a commercial advertisement about their own product or service, in violation of the Lanham Act (and Google's "Double-Serving" policies).  The statements and actions (in the form of advertising placement orders) actually deceived or has the tendency to deceive a substantial segment of its audience.  The deception is material, in that it is likely to influence the purchasing decision.  Defendants caused their false statements and advertising to enter interstate commerce.  Novation has been or is likely to be injured as a result of the false statements or advertising, either by direct diversion of sales from itself to Defendants or by lessening of the goodwill associated with its products.  Defendants' false or misleading advertising actually conveyed the false impression and thereby deceived a significant portion of the recipients.

118.    There is also initial interest confusion in that when individual sellers

Blecher Collins
Pepperman & Joye

1  using the Internet take action (click) on an offering as a result of their search for a

2  product or service, the "damage is done" when the individual seller is induced to

3  make that initial "click" and is diverted off into an erroneous direction — even if the

4  individual seller later learns the truth about the product and does not make a

5  purchase decision based on the deception or misrepresentation.

6       119.   When individual sellers first consider JG Wentworth, then (looking for

7  at least one alternative) scroll down and click on a Peachtree or Olive Branch ad

8  thinking that they will find an alternative bid to JG Wentworth, the damage to the

9  competitor is done.

10      120.   Individual consumer sellers have finite time and resources to pursue

11 every possible alternative.  If consumer sellers can be initially diverted or deceived

12 into pursuing an alternative they think is something other than what it turns out to be

13 (not a genuinely competitive alternative), the damage is done because that initial

14 confusion and misdirection (orchestrated by Defendants) causes competitive injury

15 to the competitor the consumer would have (or even might have) found but for the

16 deception and misdirection.

17      121.   For nearly four years, JG Wentworth's use of the trademarks registered

18 to its various controlled and/or wholly-owned affiliates and subsidiaries (including

19 the brand names "JG Wentworth," "Peachtree Financial," and "Olive Branch

20 Funding") has been intended to, is likely to, and has in fact "caused confusion,"

21 "mistake," and has "deceived" thousands of persons (in California and throughout

22 the United States) as to the affiliation, connection, or association of JG Wentworth

23 with "Olive Branch Funding" and "Peachtree Financial."

24      122.   When consumers use search engines such as Google to identify

25 companies providing "structured settlement cash outs," JG Wentworth pays Google

26 to simultaneously display ads for "JG Wentworth" and "Peachtree Financial" and

27 "Olive Branch Funding," suggesting falsely to any reasonable user/consumer that

28 these were and are each separate companies competing to provide the service

advertised, deceiving many (and certainly "causing confusion" among) consumers as to the affiliation, connection, or association between these companies.

123.   Further, JG Wentworth (or one or more of its controlled and wholly-owned subsidiaries) even has paid Google to display a *JG Wentworth ad* whenever consumer users ask the question "who competes with Peachtree Financial" – a literal falsehood broadcast in paid advertising for the express purpose of deceiving consumers as to the affiliation, connection, or association between these companies. For a recent example, see the mobile search "screenshot" attached as **Exhibit B**. This is no accident.  In placing its automatic paid search ad display orders, JG Wentworth (and/or its alter egos) can and do instruct Google which phrases and words, if used in a search, should NOT trigger the display of a JG Wentworth ad. JG Wentworth could easily instruct Google to NOT display its ads when a consumer types the questions "who competes with Peachtree" or the phrase "Peachtree structured settlements."  It does not do so.

124.   Similarly, JG Wentworth's alter ego Olive Branch Funding (or one of its commonly-controlled affiliates) has paid Google to display an Olive Branch Funding ad whenever consumer users ask the question "who competes with JG Wentworth" – a literal falsehood – broadcast to the public in paid advertising for the express purpose of deceiving consumers as to the affiliation, connection, or association between JG Wentworth and Olive Branch Funding.  For example, see the mobile search "screenshot" attached as **Exhibit C**.  In placing its automatic paid search ad display orders, JG Wentworth (and/or its alter egos including Olive Branch) can and do instruct Google as to which phrases and words, if used in a search, should NOT trigger the display of an ad.  Olive Branch could easily instruct Google to NOT display its ads when a consumer types the question "who competes with JG Wentworth."  It does not do so.

125.   When individual sellers use the Google search service, the users' assumption and understanding is that each result they are shown is from a different

1  company or service – especially if each APPEARS to be different by virtue of

2  common visual cues and labels such as trademarked name, brand, phone number,

3  and logo.  Individual sellers are entitled to and do in fact make this assumption

4  because (a) in their experience with using the Google service, that is generally how

5  the service works; and (b) under the published rules that Google imposes on its

6  advertisers, one advertiser (using different websites) is not allowed to run ads that

7  fill multiple search results in response to any given search.

8       126.   Thus, when JG Wentworth places its own ad, in its own name in the

9  first position, and then places its alter egos' ads in a position that internet users

10  reasonably believe to be reserved for offerings from different and competing

11  companies, JG Wentworth takes action that actively misleads and deceives sellers –

12  not only by what JG Wentworth's ads (or its alter egos' ads) *say*; but by the

13  information they deliberately conceal and by when and where those ads are placed

14  and displayed.

15       127.   The alter egos' paid search ad timing and placement is specifically

16  programmed, by JG Wentworth, to be displayed in a place and time which deceives

17  sellers who have been led to assume (by experience, context, and the rules of the

18  service itself) that they are being shown an offering that is different from and

19  unrelated to the bidder they've already found listed above.

20       128.   When Google users click on the 2nd or 3rd search result displayed, they

21  do so because they expect to find something *different* than they've already found in

22  listing #1. When JG Wentworth pays Google to show a JG Wentworth ad in position

23  1 and its alter egos in positions 2 and/or 3, JG Wentworth is paying to create a

24  context in which the consumer is foreseeably misled and deceived.

25       129.   JG Wentworth tricks individual sellers who click on listings 2 and/or 3

26  into thinking they have found what they were looking for – an alternative to search

27  results 1 and/or 2 – and to then proceed no further.  This activity (which violates

28  Google rules and is designed to deceive) excludes Novation from competing.

Blecher Collins
Pepperman & Joye

130.   Novation, a direct competitor of JG Wentworth, has been injured, suffered loss of business, income, and profit as a result of the aforementioned violations because many customers who would have considered and traded with Novation did not do so because they were confused, mistaken, and/or deceived as to the affiliation, connection, or association between JG Wentworth, Peachtree Financial, and/or Olive Branch Funding; were led to believe, falsely, that they had obtained competing bids from one or more of those "companies" and therefore did not proceed to research or consider a bid or offer from Novation.

C.     **Fourth Claim:  Violation of Cal. Bus. & Prof. Code §§ 17200 et. seq.**

131.   Novation repeats and alleges and incorporates by reference each allegation set forth in Paragraphs 1–130, inclusive, of this First Amended Complaint with the same force and effect as if set forth in full herein.

132.   Section 17200 of the Business & Professions Code proscribes "any unlawful, unfair or fraudulent business act or practice."  This sweeping statute is written in the disjunctive and broadly covers the foregoing three varieties of unfair competition.  The statute's purpose is to protect both consumers and competitors in commercial markets for goods and services.

133.   Novation is a "person" within the meaning of Business & Professions Code section 17201.

134.   Defendants' conduct constitutes an "unlawful, unfair or fraudulent business act or practice."

135.   Defendants' "unlawful, unfair or fraudulent business act or practice" results in Defendants being unjustly enriched and making huge profits, much of which is extracted from unwilling consumers.  The ill-gotten revenues and profits make the Defendants' conduct a violation of Section 17200 of the California Business & Professions Code.

136.   Novation is entitled to equitable relief in the form of an injunction to prevent future violations.

-37-

1    137.   Under section 17203, the entry of permanent and mandatory injunctive

2    relief against Defendants is necessary to require that Defendants' "unlawful, unfair

3    or fraudulent business act or practice" not be permitted to continue in the future.

4    Novation is entitled to seek an injunction under the UCL whether or not restitution

5    is also available.

6    138.   Novation's efforts in securing the requested relief will result "in the

7    enforcement of an important right affecting the public interest" for "(a) significant

8    benefit, whether pecuniary or non-pecuniary, has been conferred on . . . .a large

9    class of persons, (b) the necessity and financial burden of private enforcement . . .

10   are such as to make the award appropriate, and (c) such fees should not in the

11   interest of justice be paid out of the recovery, if any." Cal. Civ. Proc. Code §

12   1021.5.  Accordingly, Novation requests that the Court award attorneys' fees

13   pursuant to Code of Civil Procedure section 1021.5.

14   **D.    <u>Injury to Novation</u>**

15   139.   By reason of the foregoing, Novation has suffered antitrust injury, *i.e.*,

16   injury resulting directly from a reduction in the vigor of the competitive process in

17   the factoring of structured settlements.  Consumers have been deprived of the

18   benefit of competition in that industry and have been effectively deprived of true

19   choice.  Coercive activity that prevents its victims from making free choices

20   between market alternatives is antitrust injury.  This injury consists of Novation

21   being foreclosed from the opportunity of competing in the aforesaid relevant

22   product market and continuing to operate as a competitive force in that market.

23   140.   As a result, Novation has been, and will continue to be, deprived of the

24   revenues and profits that it would otherwise have earned in the competitive process.

25   141.   In addition, but for the illegal merger and the subsequent

26   monopsonizing conduct, the value of Novation as an ongoing concern would have

27   continued to increase, whereas now its business has a reduced value because it has

28   been substantially excluded as a competitor as a result of the integration of JG

Blecher Collins
Pepperman & Joye

1  Wentworth and Peachtree and Olive Branch and the follow-on anticompetitive

2  conduct.  Novation does not now know the exact amount of the damages caused by

3  the conduct described in this claim for relief, but believes such damages to exceed

4  $15,000,000.

5  **RELIEF REQUESTED**

6  **WHEREFORE**, Plaintiff Novation requests entry of judgment against

7  Defendants as follows:

8  1.      That the acquisition by Defendant JG Wentworth of Defendant

9  Peachtree be adjudged and decreed to violate Section 7 of the Clayton Act, and that

10  Defendant JG Wentworth be required to either (a) divest itself of the assets acquired

11  from Defendant Peachtree and to reconstitute a new and effective competitor, or (b)

12  be ordered to cease engaging in the post-merger marketing, branding, advertising,

13  and coordinated bidding activity which has substantially undermined the ability of

14  consumer sellers to find bidders that genuinely compete with Defendants and

15  precluded Plaintiff Novation from the opportunity to offer competing bids to said

16  consumer sellers;

17  2.      That Plaintiff Novation recover treble damages, costs, and reasonable

18  attorneys' fees for the alleged violations of Section 7 of the Clayton Act and Section

19  2 of the Sherman Act as alleged herein;

20  3.      That Plaintiff Novation recover from Defendants treble damages, costs,

21  and reasonable attorneys' fees for the violations of the Lanham Act as alleged

22  herein, that Defendants be required to disgorge profits and monies reaped from their

23  violations of the Lanham Act, and be enjoined from further violations of the

24  Lanham Act;

25  4.      That it be adjudged and decreed, as alleged in the fourth claim for

26  relief, that Defendants have engaged in unlawful, unfair or fraudulent business acts

27  or practices in violation of section 17200 et seq. of the California Business &

28  Professions Code and that the Court order injunctive relief to Novation pursuant to

1  section 17203; and that the Court award, pursuant to Cal. Civ. Proc. Code section

2  1021.5, reasonable attorneys' fees to Novation;

3      5.      That an injunction be issued preventing future violations; and

4      6.      Such other and further relief as may be just and proper.

5

6  Dated: October 13, 2015             BLECHER COLLINS
                                       PEPPERMAN & JOYE, P.C.
7

8

9

10                                     By:   ___/s/ Maxwell M. Blecher___

11                                           Maxwell M. Blecher
                                             Attorneys for Plaintiff
12                                           Novation Ventures, LLC

13  77854.2

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### **DEMAND FOR JURY TRIAL**

2       Plaintiff hereby demands trial by jury pursuant to the Federal Rules of Civil

3  Procedure, Rule 38(b) and Local Rule 38-1.

4

5  Dated:  October 13, 2015        BLECHER COLLINS

6                            PEPPERMAN & JOYE, P.C.

7

8

9                       By:      /s/ Maxwell M. Blecher

10                          Maxwell M. Blecher

11                       Attorneys for Plaintiff

                           Novation Ventures, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28